UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FLOYD CALDWELL,

           Petitioner,                                  Hon. Richard Alan Enslen

v.                                                Case No. 4:04-CV-133

BLAINE LAFLER,

           Respondent.

_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Caldwell's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Caldwell's petition be **denied**.


## BACKGROUND

        Following a bench trial, Petitioner was convicted of two counts of armed robbery and sentenced to life in prison. (Trial Transcript, Dec. 3, 1975, 202-10). The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Caldwell*, No. 28026, Opinion (Mich. Ct. App., Jan. 25, 1978). The Michigan Supreme Court likewise affirmed Petitioner's conviction. *People v. Caldwell*, No. 64137, Order (Mich., Mar. 17, 1980). Petitioner pursued post-conviction relief, without success. (Dkt. #23, 25-26). In 1985, Caldwell filed a petition for writ of habeas corpus in the United States District

Court for the Western District of Michigan.  (Dkt. #15, Exhibit A).  His petition was denied on March 3, 1986.  *Id.*

On September 22, 2000, Petitioner again moved in the trial court for relief from judgment based upon "newly discovered evidence" (police reports and other documentary evidence) which had allegedly not been disclosed prior to his 1975 trial.  *People v. Caldwell*, No. 1975-1734-FY, Order (Berrien Cnty. Trial Ct., Feb. 15, 2001).  Following an evidentiary hearing, (dkt. #20), the court denied Petitioner's motion for relief.  *People v. Caldwell*, No. 1975-1734-FY, Opinion (Berrien Cnty. Trial Ct., May 31, 2002).  Specifically, the court found that "even if defense counsel had been provided with the police reports and had used them in the defense, there would have been no reasonably likely chance of acquittal."  *Id.*  Petitioner appealed this determination to the Michigan Court of Appeals and the Michigan Supreme Court without success.  (Dkt. #27-28).  On September 27, 2004, the Sixth Circuit Court of Appeals granted Caldwell's motion to file a second or successive petition for writ of habeas corpus.  (Dkt. #1).  Caldwell then initiated the present action for habeas relief on October 13, 2004, in which he asserts the following claim:

> The trial court reversibly erred in denying Petitioner relief from judgment on the grounds that he did not sufficiently establish he was prejudiced by the non-disclosure of the police reports.

The Court conducted an evidentiary hearing in November 2007, at which Petitioner was afforded the opportunity to demonstrate that he was entitled to relief.  (Dkt. #97-99, 101).

## LEGAL STANDARD

The sole claim asserted in Caldwell's petition is that he was deprived at trial of certain evidence, the denial of which deprived him of the right to a fair trial.  In *Brady v. Maryland*, 373 U.S.

83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material either to guilt

or to punishment, irrespective of the good faith or bad faith of the prosecution." *Wilson v. Mitchell*, 498

F.3d 491, 512 (6th Cir. 2007) (quoting *Brady*, 373 U.S. at 87).

Caldwell's petition, filed October 13, 2004, is subject to the provisions of the

Antiterrorism and Effective Death Penalty Act (AEDPA).  With respect to a claim asserted in an initial

petition for writ of habeas corpus, the following standard applies:

> (d)     An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim —
>
> (1)     resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States, or
>
> (2)     resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence
> presented in the State court proceeding.

28 U.S.C. § 2254(d).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when

"the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*,

324 F.3d 423, 429 (6th Cir. 2003).

In articulating the proper standard, the Court held that a writ may not issue simply

because the reviewing court "concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

However, because Caldwell's habeas claim is being asserted in a second or successive petition, he must satisfy the following standard, specifically sections (B)(i) and (B)(ii):

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made

retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2).

To prevail in this matter Petitioner must establish that his trial was infected with an error of constitutional magnitude and must, furthermore, demonstrate that but for this constitutional error (the factual predicate of which could not have been discovered previously through the exercise of due diligence) "no reasonable factfinder" would have found him guilty of armed robbery. *See In re Lott*, 424 F.3d 446, 447 (6th Cir. 2005) (observing that "for [petitioner] to succeed in this second application for habeas relief, he must establish that but for the constitutional errors during his trial, no reasonable factfinder would have found him guilty of the [crime]") (citing 28 U.S.C. 2244(b)(2)(B)(ii)).

The threshold articulated in 28 U.S.C. § 2244(b)(2)(B)(ii) is referred to as an "actual innocence" standard. *See, e.g., Calderon v. Thompson*, 523 U.S. 538, 558 (1998). In the context of habeas corpus jurisprudence, however, there exist two separate and distinct "actual innocence" standards. A brief discussion of the differences between these two standards is, therefore, necessary.

In *Schlup v. Delo*, 513 U.S. 298 (1995), the Court held that "a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas

petition." *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (citing *Schlup*, 513 U.S. at 317). Such a claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Souter*, 395 F.3d at 588-89 (quoting *Schlup*, 513 U.S. at 315).

To satisfy the *Schlup* actual innocence standard, a petitioner must demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 327). Moreover, "actual innocence means factual innocence, not mere legal insufficiency." *Souter*, 395 F.3d at 588-89 (quoting *Schlup*, 513 U.S. at 327). Such a claim "requires petitioner to support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 324). The *Schlup* Court further cautioned that "the actual innocence exception should remain rare and only be applied in the extraordinary case." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 321).

In enacting the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Congress "adopted a more stringent actual innocence exception" in the context of second or successive petitions such as Caldwell's. *Souter*, 395 F.3d at 590 n.5. First, Petitioner must establish that the factual basis for his *Brady* claim could not have been discovered previously through the exercise of due diligence. *See* 28 U.S.C. § 2244(b)(2)(B)(i). This was not a requirement in the *Schlup* actual innocence analysis. Petitioner must also demonstrate not merely that "it is more likely than not" that no reasonable juror would have found him guilty, but instead Petitioner must establish by *clear and convincing* evidence that, *but for constitutional error*, no reasonable factfinder would have found him guilty. *See* 28 U.S.C.

§ 2244(b)(2)(B)(ii) (emphasis added).  The Supreme Court has interpreted this provision as requiring a petitioner to demonstrate by clear and convincing evidence that he is innocent of the crimes for which he was convicted.  *Calderon*, 523 U.S. at 558 ("a federal court can consider a claim presented in a second or successive application only if the prisoner shows, among other things, that the facts underlying the claim establish his innocence by clear and convincing evidence").

## ANALYSIS

I.          Petitioner's Trial

As noted above, Petitioner asserts that he was deprived of certain evidence prior to his 1975 trial.  However, before assessing this claim and the impact of any such deprivation, it is necessary to first detail the evidence presented at Petitioner's trial.  The relevant portions of this evidence are as follows:

**Thomas Luitje**

The parties stipulated that had Luitje been called as a witness he would have testified as to the following facts: (1) he was employed and working at Luitje's Coins and Antiques on June 10, 1975; (2) Luitje's Coins and Antiques is in the business of buying and selling jewelry; (3) on June 10, 1975, Petitioner entered Luitje's Coins and Antiques; (4) Petitioner asked Luitje if he was "interested in a ring" that he had; (5) Petitioner told Luitje that the ring had been appraised at $700; and (6) soon thereafter, police officers arrived at Luitje's Coins and Antiques and arrested Petitioner.  (Trial Transcript, December 2, 1975, 11-12).

**Harry Laity**

     A.    Direct Examination

On the evening of May 30, 1975, Laity and his wife, Frances, returned home at approximately 10:30 p.m. (Tr. 13-14). Laity drove into the garage and turned off the car's lights. (Tr. at 14). As he began to exit his car, a man "grabbed" Laity by the throat and said, "I'm going to kill you if you don't give me your money." (Tr. at 14-15). Laity attempted to escape the man's grasp, at which point the man struck Laity in the chest with a knife. (Tr. at 15). Because the knife was dull, and because Laity was wearing a suit coat, the knife did not penetrate Laity's skin. (Tr. at 16). The man then reiterated his demand that Laity surrender his money. (Tr. at 16-17).

While this was occurring another man held Frances Laity and "had his hand over her mouth." (Tr. at 17). Harry Laity then gave his assailant the money from his wallet and pockets as well as the money from his wife's purse. (Tr. at 17-18). Mr. Laity's assailant then instructed Laity to "get back in the car, shut the door and stay there." (Tr. at 18). After the two men departed, Laity and his wife entered the house and telephoned the police. (Tr. at 18-19).

Laity testified that the car he was driving on the night in question was equipped with a functioning interior dome light. (Tr. at 20). Laity further testified that because his car door was open during the robbery, the dome light provided enough light for him to identify Petitioner as his assailant. In this respect, Laity testified that there was no doubt in his mind that Petitioner was his assailant. (Tr. 20).

B.      Cross-Examination

Laity testified that he participated in two line-up procedures on June 12, 1975. (Tr. at 21-22).  With respect to the initial line-up, Laity asserted that the third participant was the man who attacked him and that the fourth man was the individual who attacked wife.  (Tr. at 22-23).  Laity reiterated that the third participant in the initial line-up was the man who robbed him.  (Tr. at 24).  Laity asserted that individual was Petitioner.  (Tr. at 24).  As for the second line-up procedure, Laity testified that the third participant was "the only one it could have been but I don't think that's the man."  (Tr. at 24-25).  Laity stated that the third participant "didn't look sufficiently like the man" who attacked him.  (Tr. at 25).

Laity reiterated that his car's interior lights were on during the robbery.  (Tr. at 26-27).  When asked whether he got "a pretty good look at" his assailant, Laity testified that "I don't know that I would say I had a good look, but I saw him."  (Tr. at 28).  Laity further testified that he "was looking at" his assailant during the attack, which lasted "a minute or two minutes."  (Tr. at 28).  Laity stated that his assailant "had a little scar on his forehead or a little something, either a scar or a mark."  (Tr. at 30).  When challenged as to whether Petitioner had any such "mark" or "scar," Laity (after examining Petitioner from a short distance) testified that he saw "a mark where the hair is short. . .it casts a shadow where the hair is short."  (Tr. at 32).

Laity was again questioned about the accuracy of his identification of Petitioner as his assailant, during which the following exchange occurred:

Q:      And you do remember there were, in fact, two line-ups?

A:      Oh, yes.

Q:      And at the first of those, it involved five people, you were viewing through a one-way mirror?

A:      Right.

Q:    And it's your opinion today or your belief today that number three in that line-up through the one-way mirror is your assailant?

A:    That is correct.

Q:    And you feel certain that that same individual is this individual, Floyd Caldwell?

A:    I think so.

Prosecutor:    What was the answer?

Mr. Laity:    I think so.

Prosecutor:    Thank you.

Q:    But you are certain that number three in the line-up through the one-way mirror was the person that attacked you?  That you are certain of; is that correct?

A:    I'm certain Mr. Caldwell is the man who attacked me.  If he is the same man as number three, then it was number three, but number three is the man I picked out from that group.

(Tr. at 39.

When again asked about his identification at the first line-up procedure, the following

exchange occurred:

Q:    And what did you do at that line-up; did you identify any of the individuals?

A:    I said I thought that number three and number four were the men.

Q:    Did you also say then and have you also testified today that you were positive that number three in that line-up was the individual that assaulted you?

-10-

A:       I don't know whether I - - you say are you positive he was the person I picked out.  Those were the two people I picked out.

Court:  Are you making your identification of Mr. Caldwell today on the basis going back to your rememberances of the night of the robbery, or are you doing that on the basis of what you observe about him today in this last hour that you and he have been almost facing each other, or are you doing it all on a belief that he was number three and that number three was the one that you said did it?

A:       No, I'm basing it on having seen him at the preliminary examination for some time and today.  Number three at the line-up of number one, they faced us, then they turned to the side, then they turned to the back, around, so on, and I said those are the two, I think.

Court:  For the sake of the record, you have snapped your fingers three times.  That would indicate to me that these were very short observations?

A:       They were.

Court:  Snappy, short observations in that line-up?

A:       They were.

(Tr. at 42-44).

With respect to the second line-up procedure, the following exchange occurred:

Q:       And you have testified that at the second line-up through the visiting cell one person - - would you carry on from there so I don't put words in your mouth?  What did you say about this one individual that you identified?

A:       I said he could be the only one and I didn't think it was he.

Q:       Why didn't you think it was he?

-11-

A:    Why, because he had a beard.  I didn't think he could grow a beard.  It was a straggly beard, but I didn't think it would be that long in that length of time.

(Tr. at 48).

The following exchange then occurred:

Q:    Are you saying that the individual you chose as number three at the second line-up through the visiting cell had different characteristics than the individual that assaulted you, different facial characteristics?

A:    Well, I said I didn't think he was the one.  He - - it was the first time I had had any experience with a line-up.  I have seen line-ups on television; you have them all in one line, then you can compare one with another.  In this case you saw five, then you saw another group of five 15 minutes later, and I wasn't - - I said he was the only one; then I looked again and I didn't think he was the one.

Q:    So to this day number three in the second line-up through the visiting cell - -

A:    Is out.

Q:    He's out?

A:    He's out.

Q:    You don't believe he is the one?

A:    I don't believe he was the one.

Q:    Again, is that because of both the beard and because of facial characteristics that might differ between number three in the visiting cell line-up and the individual who you considered to be your assailant?

A:    I believe that's right.  They were both about the same build, the same height, so on, but they didn't look quite alike.

-12-

Q:      They didn't look quite alike.  So number three in the
        second line-up didn't look like the defendant?

A:      That was my impression.

Q:      What would you think if I told you that number three in
        the second line-up through the visiting cell was, in fact,
        the defendant, Floyd Caldwell?

A:      I would think you were mistaken.

(Tr. at 50).


C.      Re-Direct Examination

When asked whether the line-ups in question were "conducted relatively quickly," Laity

testified, "they were."  (Tr. at 52-53).  Laity testified that during the robbery "there was lighting from

the inside of the car, the dome light and the dash."  (Tr. at 53).  Laity reiterated that he had the

opportunity to observe his assailant for "several minutes" during the robbery.  The following exchange

then occurred:

Q:      And at the preliminary examination did you identify this
        defendant, Floyd Caldwell, as your assailant?

A:      I did.

Q:      And you have observed Mr. Caldwell here in court this
        morning, have you not?

A:      I have.

Q:      Now, are you basing your identification of Mr. Caldwell
        this morning on any line-up that you saw, or are you
        basing it on your impressions at the scene of the crime
        and your opportunity to observe him today?

A:      On the opportunity to observe him today.

-13-

> Q:   Your identification of Mr. Caldwell in court this morning
>      was not then based on anything that happened at the line-
>      up?
>
> A:   No.

(Tr. at 54).


D.   Re-Cross Examination

Petitioner again challenged the accuracy of Mr. Laity's identification, as evidenced by

the following exchange:

> Q:   It's been established on June 12, 1975, you appeared at
>      two line-ups, and we can deduce from that that was
>      approximately two weeks after this alleged assault
>      occurred.  Is it true that two weeks after this alleged
>      assault occurred that you identified another individual in
>      a line-up as your assailant, a person totally unrelated to
>      this case?  Yes or no.
>
> A:   I don't know if he was totally unrelated or not.
>
> Q:   Is it a fact - -
>
> A:   I identified two people.  In the first line-up I said this is
>      the one I think was the man, and on the second line-up - -
>      I said number three in both cases - - number three is the
>      only one that could be and I don't think he is the one
>      because he wasn't the same - - I didn't say that, but the
>      reason I said that I don't think he is the one is because he
>      wasn't - - I knew they were two different people.
>
> Q:   All right.  Now, again - -
>
> A:   If I had seen number two first, I don't know.
>
> Q:   Again we have an understanding that the line-up occurred
>      approximately two weeks after this assault occurred?
>
> A:   That's right.

Q:      And you viewed people in two line-ups.  Isn't it a fact that at the first line-up, the line-up we had through the one-way mirror, you identified another individual, an individual - -

A:      I identified number three.

Q:      - - an individual now known to us as Arthur Wilkins as your assailant?

A:      I don't know whether he is Arthur Wilkins or not.

Q:      Number three in the first line-up?

A:      Number three was the one that I identified.

Q:      Is it also fair to say within two weeks of the time of this assault you indicated a second person in a second line-up was not your assailant and that that individual, the second individual in the second line-up - - or the third person in the second line-up looked different, had different facial characteristics, so on; is that correct?

A:      I thought that he was not the one.

Q:      And do you now know that the individual, number three in the second line-up, is, in fact, the defendant Floyd Caldwell?

A:      I hear you say so.

Q:      And if that is a fact, if we assume that is a fact, does that in any way take away from your identification, your positive identification - -

A:      Of him now?

Q:      - - of this defendant as your attacker?

Court:  Now I think he means, yes, sir.

Q:      Yes, sir.

-15-

A:     No, because I have had the chance to see him longer.
       Before I don't know whether it was a full minute or not.

(Tr. at 61-63).


**Frances Laity**

    A.      Direct Examination

On the evening of May 30, 1975, Laity and her husband returned home between 10:00 and 10:30 p.m.  (Tr. 72-73).  After parking the car in the garage her husband opened his door to exit the vehicle, at which point "this man stepped between the door and the seat of the car and attacked him." (Tr. 73).  She observed this occur.  (Tr. 73-74).  Mrs. Laity then opened her car door and attempted to exit the vehicle, at which point another man "grabbed" her.  (Tr. 74).

Laity then heard the man who attacked her husband state, "give us your money or we'll kill you."  (Tr. 74).  The man then grabbed her husband by the throat and attacked him with a knife.  (Tr. 74).  At the same time, Laity's attacker placed his hand over her mouth and pushed her "back against the seat" of the car.  (Tr. 74).  Despite being restrained in this fashion, Laity was able to turn enough to see her husband's attacker.  (Tr. 82).  Her husband's attacker kept demanding money.  (Tr. 75).  Her husband then surrendered the money from his wallet, as well as the money from her purse.  (Tr. 75).

Frances Laity's attacker then removed from her hands three rings, her wedding ring, her engagement ring, and a sapphire and diamond ring.  (Tr. 76-77).  With respect to this latter item of jewelry, Laity testified that "the setting is most unique" and that "I have never seen one before or afterwards with a setting like that."  (Tr. 77).  When she was presented at trial with the ring which was later recovered from Petitioner, Laity testified that she was "positive" that it was her ring.  (Tr. 76-77, 118-19).  Laity then testified that she and her husband were instructed to "get into the car" and "stay

-16-

there." (Tr. 78).  The Laitys did as instructed, but after "a moment or two" the couple entered their home and telephoned the police.  (Tr. 78-79).

Laity testified that during the attack the dome and interior lights of their car were on.  (Tr. 79).  She also reported that there was a flood light "on either side of our garage."  (Tr. 79).  According to Laity, light from these flood lights entered the garage through the garage windows further illuminating the garage.  (Tr. 79-80).  Laity testified that the lighting conditions in the garage at the time of the robbery were sufficient "to recognize the face" of their attackers.  (Tr. 81).  Laity identified Petitioner as the man who attacked her husband, after which the following exchange occurred:

> Q:   Are you certain that that is the man that attacked your husband?
>
> A:   Yes, I am.
>
> Q:   Have you seen the defendant, Mr. Caldwell, between the time of the robbery and this morning in court?
>
> A:   I saw him in the line-up and I saw him at the time of the preliminary examination.
>
> Q:   Did you identify him in the line-up?
>
> A:   Yes, I did.
>
> Q:   And did you identify him at the time of the preliminary examination?
>
> A:   Yes, I did.
>
> Q:   Is your testimony today based on the line-up and the preliminary examination, or is it based on your memory of the events that happened on the night of May the 30th?
>
> A:   Well, today it is certainly based on my memory of the events that happened May 30th.

(Tr. 82-83).

B.      Cross-Examination

When questioned as to how well she was able to observe her husband's attacker, Laity testified that Petitioner was standing in the open car door and that she "could look at him and through the opening of the edge of the door and the frame of the car." (Tr. 87). Laity further testified that "I know that I saw the man's face and he was there for at least an appreciable length of time, a minute or so, after the initial blow and the grasping of my husband's throat." (Tr. 88). When again questioned how she was able to see her husband's attacker given that he was standing outside the opposite side of the vehicle, Laity stated that she was able to observe him "because he bent in to make more emphatic his demand that we would give him money or he would kill us." (Tr. 88-89).

When asked why she was so confident in her identification of Petitioner, Laity testified that "the individual's head was dolichocephalic, which means the length is greater than the width, it is not nearly round or square head, and I think that stood out." (Tr. 94). Laity testified that based on her academic training and experience working with "a large number of black students," a "minority" of blacks possessed this particular characteristic. (Tr. 97-98). She further stated that "those very peculiar, shall I say, identifications come to mind when one is faced with a very traumatic experience." (Tr. 94). Laity also testified that her husband's attacker had a "slight mark" on "the right side of his brow or forehead." (Tr. 99). When challenged on this particular matter, the following exchange occurred:

Q:      All right. Do you see Mr. Caldwell in court today?

A:      Yes, I do.

Q:      Do you see on him today the mark that you talked about seeing on the assailant on the day that this allegedly occurred? If you like, please feel free to step down and walk over near Mr. Caldwell and see if you can identify him.

A:      Well, may I?

Q:      Please do.

A:      I see a slight - turn this way - a slight mark.  I hardly call
        it a scar today, which in view of the fact that the other was
        - - July, August, September, October - - four, five months
        ago, any scar tissue or any disfiguration in the skin might
        be somewhat - -

Q:      Do you see something on Mr. Caldwell's face that
        reminds you of something you saw on your assailant's
        face?

A:      Yes.

Q:      What is that, if you would point to it?

A:      There is this right here.

Court:  Excuse me.  That's fine.  If he will just sit there, that's
        good, and I can see now.  Go ahead, Mrs. Laity, what
        were you saying, what were you pointing to, ma'am?

A:      I was pointing to this slight mark here and a mole.  Now
        this mark at the present time does not look as much scar
        tissue as it might have been in the past, but there is a line.

Court:  Thank you.

Q:      And you are saying that the thing, whatever it might be, if
        at all, that you pointed to is what you recognize and
        characterize as a mark that you saw on May 30, 1975?

A:      It is.  Might I say this:  that my recollection of it at that
        time and the time of the preliminary examination was that
        it was more visible than at the present time, which would
        be quite possible because of a lapse of time.

(Tr. 101-03).

**Willie Elliott**

        A.     Direct Examination

On June 10, 1975, Elliott was employed as a detective for the Benton Harbor Police Department.  (Tr. 116-17).  On that day he was dispatched to Luitje's Coins and Antiques.  (Tr. 117).  Petitioner and Sidney Caldwell were at this establishment when he arrived.  (Tr. 117-18).  Thomas Luitje informed Elliott that Petitioner had asked him if he was "interested in" a ring valued at $700.  (Tr. 118-19).  Petitioner was arrested and the ring confiscated.  (Tr. 118-19).  Elliott testified that the ring which Mrs. Laity identified as having been stolen from her on the night of the robbery was the same ring he confiscated from Petitioner following his arrest.  (Tr. 119-20).

        B.     Cross-Examination

Elliott testified that along with Mrs. Laity's ring, officers confiscated a black metallic box.  (Tr. 121-22).  Elliott also testified that following his arrest, Petitioner stated that "he had found [the ring] while he was cutting grass someplace."  (Tr. 126).

**Robert Massengale**

        A.     Direct Examination

Massengale testified that as of June 10, 1975, he was employed as a detective for the Benton Harbor Police Department.  (Tr. 128).  He further testified that he was assigned to investigate the May 30, 1975 robbery of Harry and Frances Laity.  (Tr. 128-29).

B.     Cross-Examination

Massengale testified that he was present at Luitje's Coins and Antiques when Petitioner was arrested. (Tr. 129). Massengale indicated that officers recovered Mrs. Laity's ring, as well as an "old" black metallic box. (Tr. 129-31). Massengale indicated that the box was "approximately two, three inches square." (Tr. 130). He further indicated that this box was not a "ring box." (Tr. 130).

**Julie Hodge**

The parties stipulated that had Hodge been called as a witness she would have testified as to the following facts: (1) during the summer of 1975 she was employed at Fox's Jewelry Store in Benton Harbor; (2) on "a day during the summer a black male" entered Fox's Jewelry with a sapphire and diamond ring; (3) the man "asked about the value" of the ring; (4) the ring was dirty; (5) the man also had a "black metal container"; (6) she recalls the incident because "the ring itself was so memorable"; (7) she cleaned the ring; and (8) the man was given an appraisal of the ring's value. (Tr. 132-33).

**Rene Osby**

The parties stipulated that had Osby been called as a witness she would have testified as to the following facts: (1) she knows Floyd Caldwell; (2) that on different occasions Floyd Caldwell has been at her home; (3) she "cannot remember" when any of these visits occurred; and (4) it has been

"quite a while from the date of the interview[1] since she's seen [Floyd Caldwell] at her home or any other place. (Tr. 133-34).

**Lizzie Osby**

The parties stipulated that had Osby been called as a witness she would have testified as to the following facts: (1) she knows Floyd Caldwell; (2) that on "prior occasions" Caldwell has been at her home; and (3) Caldwell last visited her home "during the month of May, 1975, but she is unable to remember the day of the week or the date of the month." (Tr. 134-35).

**Floyd Caldwell**

    A.    Direct Examination

Petitioner denied having any involvement in the robbery of Mr. and Mrs. Laity. (Tr. 146). He testified that on the evening of May 30, 1975, he drove to Eau Claire and visited with Rene and Lizzie Osby. (Tr. 144-45). Petitioner reported that he remained at the Osby's until "pretty close to" 2:00 a.m. (Tr. 145-46).

Petitioner testified that while mowing his grass on June 10, 1975, he found Mrs. Laity's ring lying on the ground in a black box. (Tr. 135-37). Petitioner testified that he was going to give the ring to his girlfriend, but that he first "wanted the ring appraised and everything." (Tr. 144). Petitioner testified that he did not know that the ring had been stolen. (Tr. 144).

---

[1] This appears to refer to an interview that Detective Darryl Williamson conducted with Ms. Osby on November 22, 1975. (Petitioner's Hearing Exhibit 7 at 8).

Later that day, Petitioner telephoned Fox's Jewelry. (Tr. 137). Petitioner informed the girl who took his call that he had found a ring and asked whether he could "bring it out." (Tr. 137). The girl responded, "yeah." (Tr. 137). Because he did not possess a driver's license, Petitioner called his cousin Sidney Caldwell to drive him to Fox's Jewelry. (Tr. 136-37). After cleaning the ring, the girl at Fox's informed Petitioner that the ring was "probably worth about $500." (Tr. 140). When Petitioner asked the girl what he should do, she told him, "well, why don't you put an ad in the paper because maybe somebody, you know, have (sic) lost it." (Tr. 140). The girl further stated to Petitioner, "it seems to be a very valuable ring" and "it seems to be worth more than 500" dollars. (Tr. 140).

After leaving Fox's Jewelry, Petitioner and his cousin went to the East End Bar where he talked with a "man" for "about" two minutes. (Tr. 141). Petitioner and his cousin then went to the Modle Loan Company which directed him to Williams Jewelers. (Tr. 141). The man at Williams Jewelers instructed Petitioner to take the ring to a coin shop. (Tr. 141-42). Petitioner and his cousin then went to the coin shop where they were arrested. (Tr. 142-43). Following his arrest, Petitioner told the arresting officers that he "found" the ring. (Tr. 143-44).

Petitioner also testified that portions of two of the fingers on his left hand had been cut off during a work-related accident. (Tr. 147). The trial judge observed that the fingers in question appeared to have been amputated at "the second joint." (Tr. 147).

B.      Cross-Examination

Petitioner testified that he was right-handed and that his injury did not interfere with his ability to use the thumb and first two fingers of his left hand. (Tr. 149-50). Petitioner testified that the first three fingers of his left hand were "fully operable" and "normal in every way." (Tr. 149-50).

Petitioner testified that on the day of the robbery, he drove to Eau Claire. (Tr. 150-51). When asked why he was able to drive himself to Eau Claire on May 30, 1975, but was unable to drive to Fox's Jewelry on June 10, 1975, Petitioner stated that "sometime I take a notion to drive" despite the fact that he did not possess a driver's license. (Tr. 151).

Petitioner testified that prior to finding Mrs. Laity's ring in his yard, he had last mowed his grass on or about June 3, 1975. (Tr. 155-57). According to Plaintiff, Mrs. Laity's ring was not in his yard at that time. (Tr. 157).

When asked about his testimony that he planned on giving Mrs. Laity's ring to his girlfriend, Petitioner stated that "I'm not saying I wouldn't have sold the ring." (Tr. 157-58). When asked why he kept going from "store to store" in an apparent effort to sell the ring, Petitioner stated that he was simply attempting to "get it appraised." (Tr. 158). Petitioner acknowledged, however, that he got the ring appraised at Fox's Jewelry, the first store he went to. (Tr. 158). When asked why he nonetheless kept taking the ring to other stores after obtaining an appraisal, Petitioner simply responded that "they sent me from store to store." (Tr. 158). As for the suggestion that he place an ad in the newspaper, Petitioner testified that "I was going to do this the next morning." (Tr. 159).

Petitioner was asked about his conversation with Mr. Zepik, the man who operated the Modle Loan Company. (Tr. 160). Petitioner was asked whether he had informed Mr. Zepik that he [Petitioner] had previously turned the ring into the police which, after being unable to locate the ring's owner, had returned the ring to Petitioner. (Tr. 160-62). Petitioner denied making any such statements. (Tr. 161-62). Upon further questioning, Petitioner insisted that he took the ring to the loan company to have it "appraised," despite the fact that he knew that the loan company was in the business of loaning money not appraising jewelry. (Tr. 162-69). When asked whether he had taken the ring to the loan

-24-

company as collateral to obtain a loan, Petitioner testified that he did not realize that you needed collateral to obtain a loan from a loan company.  (Tr. 169-70).  He testified that "I thought you had to have good credit."  (Tr. 170).

Petitioner also acknowledged that he has previously been convicted of attempted unarmed robbery and larceny by conversion, both of which were felonies.  (Trial Transcript, December 3, 1975, 175-76).

II.        What Evidence was Petitioner Denied Prior to his 1975 Trial

There is no question that Petitioner was not provided with certain evidence prior to his trial.  The state court concluded that such was the case and that decision is supported by the record.  However, the state court did not specifically identify precisely what material had not been provided to Petitioner.  Petitioner asserts that the information contained in Exhibits 2, 3, 4, 5 and 7, which he introduced at the evidentiary hearing constitutes *Brady* material.  While Respondent has persuasively argued that Petitioner did, in fact, possess much of this information prior to trial, the Court nonetheless finds that Plaintiff has satisfied his burden of demonstrating that he was deprived of this material - with two exceptions.

Petitioner's Hearing Exhibits 4 and 5 contain the reports completed contemporaneously with the two line-up procedures conducted in this matter, as well as the photographs taken contemporaneously with these line-ups.  Petitioner's counsel signed these photographs and was, therefore, aware of their existence.  Furthermore, Petitioner admitted the reports as exhibits at his criminal trial.  Thus, he can hardly argue that this information was not provided to him.  Accordingly,

the Court concludes that the *Brady* material at issue in this matter is that contained in Petitioner's

Hearing Exhibits 2, 3, and 7.

III.        Petitioner cannot Demonstrate that he Suffered a Violation of his Constitutional Rights

            As discussed above, to obtain relief Petitioner must demonstrate that he suffered a

violation of his constitutional rights and, furthermore, that but for this constitutional error "no reasonable

factfinder" would have found him guilty of armed robbery.  This latter requirement, as noted, has been

interpreted as obligating Petitioner to establish that he is actually innocent of the crimes for which he

was convicted.  Before assessing whether Petitioner has established his innocence in this matter, the

Court must first determine whether Petitioner suffered a violation of his constitutional rights.  In other

words, did the deprivation prior to trial of the evidence identified above violate the standard articulated

by *Brady v. Maryland* and its progeny.

            A.      *Brady* Standard

            In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that

"the suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good faith

or bad faith of the prosecution."  *Wilson v. Mitchell*, 498 F.3d 491, 512 (6th Cir. 2007) (quoting *Brady*,

373 U.S. at 87).  The material which must be disclosed under *Brady* "encompasses impeachment

evidence as well as exculpatory evidence."  *Wilson*, 498 F.3d at 512 (citing *United States v. Bagley*, 473

U.S. 667, 676 (1985)).  To establish a *Brady* violation, Petitioner must establish: (1) the prosecution

suppressed or withheld evidence, (2) such evidence was favorable to the defense, and (3) the suppressed

evidence was material.  *See Bushard v. Yukins*, 2004 WL 74659 at *1 (6th Cir., Jan. 7, 2004) (quoting

*Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).

    The materiality requirement is not a sufficiency of the evidence test.  *See In re McDonald*,

- - - F.3d - - -, 2008 WL 89951 at *5 (6th Cir., Jan. 10, 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419,

434-35 (1995)).  In other words, Petitioner is not required to demonstrate that consideration of the

undisclosed evidence results in less than sufficient evidence to support his conviction.  This is because

"the possibility of an acquittal of a criminal charge does not imply an insufficient evidentiary basis to

convict."  *In re McDonald*, 2008 WL 89951 at *5 (quoting *Whitley*, 514 U.S. at 434-35).  Also, the

withheld evidence must be considered "collectively, not item by item."  *Whitley*, 514 U.S. at 436-37.

    The materiality requirement is satisfied where "the favorable evidence could reasonably

be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Banks*

*v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Whitley*, 514 U.S. at 435).  In short, Petitioner must

demonstrate a "reasonable probability of a different result."  *Dretke*, 540 U.S. at 698 (quoting *Whitley*,

514 U.S. at 434).

    B.  Analysis of the Withheld Material

    Petitioner asserts that several items contained in the withheld police reports satisfy the

materiality standard identified above.

    1.  Lighting Conditions

    As noted above, Mr. and Mrs. Laity both testified that their car doors were open during

the attack and that as a result the car's dome light was illuminated during the entirety of the attack.  Both

victims further testified that the dome light provided sufficient light to observe their assailants. Frances Laity also testified that there was a flood light located outside their garage, the light from which further illuminated the garage.

The initial offense report, one of the police reports not disclosed to Petitioner, contains the following statement:

> Judge Laity stated the only light in the garage was the courtesy lights on the floor boards in the garage at the time of the robbery.

(Petitioner's Hearing Exhibit 7 at 1-2).

Petitioner asserts that this statement contradicts the Laity's trial testimony regarding the lighting conditions at the time of the attack. Accordingly, Petitioner asserts that had he been provided with this police report he would have been able to demonstrate the unreliability of the Laity's testimony. The Court disagrees.

First, the meaning of this poorly written statement is by no means clear. Petitioner asserts that this statement conveys the thought that the only light source during the robbery was the lights on the floor boards of the Laity's vehicle. While this *may* be a reasonable interpretation, it must be recognized that the statement in question does not contain any word denoting a car or other vehicle. Interpreted as written, the statement arguably conveys the thought that the only light *in the garage* originated from lights on the floor of the *garage*. So interpreted, the statement does not necessarily rule out the possibility that there was also a light source inside the Laity's vehicle. This interpretation is supported by the fact that in the same police report, the Laitys both informed police that the car doors were open during the attack. As Mr. Laity testified at trial, the dome light in his vehicle (activated when a car door was open) was functioning properly at the time of the robbery.

This statement does not suggest the absence of lighting, but at most indicates a possible discrepancy regarding the nature and/or origin of the lighting. Moreover, the statement in question does not in any way contradict Mrs. Laity's trial testimony describing the lighting conditions at the time of the attack or her testimony identifying Petitioner as her husband's assailant. The Court further notes that the Laitys' trial testimony regarding the lighting conditions is also supported by the fact that this same police report reveals that the Laitys were able to provide a detailed description of their assailants, something which they would not be able to do were the lighting conditions as poor as Petitioner asserts.

2.      Fingerprint Report

Several of the undisclosed police reports reveal that following the attack police officers obtained three latent fingerprints from the windows of the Laity's vehicle. (Petitioner's Hearing Exhibit 2 at 1-2 and Petitioner's Hearing Exhibit 7 at 5, 10-11). The laboratory analysis of these fingerprints, the results of which were not disclosed to Petitioner, revealed that two of the fingerprints belonged to Harry Laity. (Petitioner's Hearing Exhibit 3). The report concluded that the third fingerprint was not "identifiable."[2] *Id.*

Petitioner asserts that he been provided with this evidence he would have "sought to seek an exclusion of [himself]." First, this evidence does "exclude" Petitioner in the sense that the laboratory analysis determined that the two identifiable fingerprints belonged to Harry Laity. The Court fails to discern how this evidence appreciably advances Petitioner's cause. There was no evidence at trial that the Laitys' assailants touched the vehicle's windows, suggesting that the assailants' identity could be

---

   [2]   As discussed below, a fingerprint expert testified at the evidentiary hearing that the quality of this fingerprint was insufficient to ever permit a positive identification of its origin.

discerned by analyzing the car for fingerprints.  Moreover, the two identifiable fingerprints were identified as belonging to Harry Laity, not some unidentified individual.  In short, under the circumstances the Court finds little significance in the fact that police officers did not find Petitioner's fingerprints on the Laitys' vehicle.

        3.      Lavette Street Subjects

One of the undisclosed police reports revealed that across the alley from the Laity's garage were "some tall bushes" behind which somebody might be able to hide and surreptitiously observe the Laity's garage.  (Petitioner's Hearing Exhibit 7 at 3).  This report also indicated that this hiding spot "would also be a good escape route leading to Lavette St."  *Id.*  Another of the undisclosed police reports indicates that following the Laity robbery, Officers Bell and Duerr "received a call to back up officer" at the Laity residence.  (Petitioner's Hearing Exhibit 7 at 4).  The officers were also informed that the suspects in the robbery were two black males wearing dark clothes.  This report does not indicate what time Officers Bell and Duerr received this instruction.

After arriving at the Laity residence, Officer Duerr entered the residence to "try and get a better idea of what the suspect looked like."  Officer Duerr subsequently exited the residence, informing Officer Bell that "subject could not give a better description other than what was already given." The report does not indicate how long Officer Duerr was inside the Laity residence.  Officer Bell then proceeded to drive around the neighborhood, eventually returning to the "alley behind the home of the judge."  While driving down the alley, Bell observed a "tall" black male, who was wearing dark clothes, "step out" from a house on Lavette Street.

Officer Bell returned to the Laity residence and picked up Officer Duerr.  The two returned to the house on Lavette Street from which Officer Bell had observed the "subject" exit.  As they approached this house, the officers observed "two subject[s] coming out from the side of" this house.  At least one of the "subjects" subsequently re-entered this house.  Another officer then approached Officer Bell's vehicle and instructed him to "get the names of the subjects."  Officer Bell approached the house in question and spoke with one of the two subjects, a man identified as Earl Fowler.  The "other subject was reported as not being there."

Petitioner asserts that failure to provide him with these reports prior to trial violated his constitutional rights.  Again, the Court fails to discern the basis for the great weight placed on this evidence by Petitioner.  While Officer Bell's report does not indicate precisely what time he and Officer Duerr were dispatched to the Laity residence, it clearly occurred well after the robbery because the dispatch directing them to the Laity residence included the Laity's description of their assailants, given to the police who responded to the Laity's robbery report.  The report does not indicate how long it took the officers to arrive at the Laity residence.  Moreover, as noted above, after arriving at the Laity residence (and before observing the two "subjects" in question) Officer Duerr entered and remained inside the Laity residence for an unidentified length of time.  Thus, contrary to Petitioner's assertions, the two subjects mentioned in this particular report were not observed immediately following the robbery, but were instead observed well after the robbery.

Officer Bell spoke with one of the two subjects and judging from the report discerned nothing in this encounter that warranted any further investigation of these two subjects.  There is no evidence that the Laitys' assailants were unusual or possessed any unique characteristics.  Likewise,

there is nothing in the police report to suggest that there was anything unique, unusual, or suspicious about these two "subjects."

    4.    Line-up Report

One of the undisclosed police reports concerns the two line-up procedures, one of which included Petitioner, which occurred on June 12, 1975. (Petitioner's Hearing Exhibit 7 at 16). Petitioner asserts that the failure to produce this report is significant given the "many issues with the lineups." As discussed below, the Court recognizes that there exist certain questions about these line-up procedures. However, the failure to produce this particular report fails to advance Petitioner's *Brady* claim because it neither contains nor reveals any information of which Petitioner was not aware prior to his trial.

This particular report identifies the participants in the two line-ups and describes the Laity's comments regarding the participants therein. Petitioner's trial counsel attended both line-up procedures. This is evidenced by: (a) statements which Petitioner's counsel made during Petitioner's trial (Trial Transcript, December 2, 1975, 21-22); (b) the undisclosed police report itself; and (c) two of the exhibits which Petitioner introduced at trial. (Petitioner's Hearing Exhibits 4-5). Thus, the report in question contained no information which was not known to Petitioner prior to trial. That Petitioner was fully aware of the results of these two line-up procedures is evident in his cross-examination of the Laitys. Moreover, the Laity's trial testimony was consistent with the comments in the police report, thus the report contained little (if any) impeachment value. In sum, Petitioner was not prejudiced by the failure to receive this report prior to his trial.

5.    Identification Statements

Several of the undisclosed police reports contain comments regarding the Laitys' statements to the police regarding the identity of their attackers.  Petitioner claims that the failure to receive these reports prior to trial deprived him of the ability to adequately challenge the Laitys' testimony concerning their identification of Petitioner as one of their attackers.  The comments at issue are as follows.

The initial offense report indicates that the Laitys described both their assailants as black males in their "teens" or "20s."  (Petitioner's Hearing Exhibit 7 at 1).  As for the robbers' height and weight, the Laitys described one as six feet tall and 170 pounds and the other as six feet tall and "heavy."  Their assailants were both described as possessing brown eyes and black hair.  One of the assailants was further described as dark complected and possessing "long sideburns."  With respect to the assailants' clothing, the Laitys reported that one man was wearing a "light grey short sleeve knit shirt" and "no glasses," while the other man wore "brown shirt long sleeves."  This report does not indicate whether the Laitys were asked about or provided any further description or detail regarding their assailants.  *Id.* Another police report indicates that on June 2, 1975, Detective Willie Elliot again spoke with Harry Laity.  According to the detective's report, Mr. Laity told him that "he told the officer who took the original complaint everything that he could recall and that at this time there is nothing further that he can add pertaining to the suspects themselves."  (Petitioner's Hearing Exhibit 7 at 5).  Petitioner asserts that Mr. Laity's June 2, 1975 statement to Detective Elliot constitutes evidence that his identification of Petitioner is somehow unworthy of belief.

The Court finds that the impeachment value of these reports is negligible at best.  First, the suggestion by Petitioner that the Laitys' initial description of their attackers lacked detail or was

somehow deficient is not supported by the police report memorializing such. Secondly, these reports contain nothing which is inconsistent with the Laity's trial testimony or their identification of Petitioner as their attacker. A much more fertile ground for impeachment of the Laitys' identification testimony was (a) their preliminary examination testimony and (b) their actions and comments at the June 12, 1975 lineups. This information was well known to Petitioner and as the trial transcript reveals, Petitioner vigorously attempted to impeach the Laitys with this material. Moreover, the Court discerns little correlation between the Laity's alleged inability to provide police with a detailed *verbal* description of their attackers following the robbery and the credibility of their subsequent *visual* identification of Petitioner.

As previously noted, Petitioner vigorously cross-examined the Laitys at trial regarding the circumstances of the robbery and the accuracy of their identification of Petitioner as their assailant. The Court fails to discern how these particular statements would have advanced Petitioner's cause or resulted in a different outcome.

6.    Unknown Witnesses

Petitioner asserts that "numerous witnesses now known who would have supported Petitioner's innocence were never called by the defense as a direct result of *Brady* violations because they were, in fact, unknown by the defense, and therefore never known to the fact finder." Petitioner fails to identify these alleged witnesses. However, it appears that Petitioner is referring to his alleged alibi witnesses: (a) Lizzie Osby; (b) Renee Osby; and (c) Willie Osby. At trial, Petitioner testified that on the night of the Laity robbery he was visiting with the Osby's in Eau Claire, Michigan. Petitioner reiterated this claim at the evidentiary hearing.

Petitioner did not call the Osbys to testify at his trial.  Instead, he stipulated that if called to testify, Renee Osby would have testified as to the following facts: (1) she knows Floyd Caldwell; (2) that on different occasions Floyd Caldwell has been at her home; (3) she "cannot remember" when any of these visits occurred; and (4) it has been "quite a while from the date of the interview since she's seen [Floyd Caldwell] at her home or any other place."  Petitioner also stipulated that if called to testify, Lizzie Osby would have testified as to the following facts: (1) she knows Floyd Caldwell; (2) that on "prior occasions" Caldwell has been at her home; and (3) Caldwell last visited her home "during the month of May, 1975, but she is unable to remember the day of the week or the date of the month."  The contents of these stipulations is consistent with the contents of one of the undisclosed police reports. (Petitioner's Hearing Exhibit 7 at 8).  This particular police report reveals that the Osbys were interviewed by the police on November 22, 1975.  *Id.*

Another police report reveals that the police spoke with Willie Osby on November 24, 1975.  (Petitioner's Hearing Exhibit 7 at 9).  According to this report, Willie Osby informed the police that he knew Petitioner.  Osby reported that the last time he had seen Petitioner was "sometime during the spring," but that he could not even remember what month that had occurred.  Osby further stated that he did not see Petitioner "very often due to him not being a close relative."  *Id.*

At the evidentiary hearing Petitioner was asked about the Osbys' inability to corroborate his alleged alibi.  As the following exchange reveals, Petitioner blames his failure to secure testimony supporting his alibi on the fact that the police report describing the Osbys' contact with the police was not disclosed to him prior to trial:

> Q:    Now in these - - these last two police reports, basically Lizzie Osby, Willie Osby, and Renee Osby, are saying that you may have been there in Eu (sic) Claire, which is your alibi you testified.

A:      Eau Claire.

Q:      Eau Claire, I'm sorry.

A:      Yeah.

Q:      Which you testified was your defense.

A:      I know I was there.

Q:      Yeah, okay.  But they said they couldn't remember the
        specific day that you were there in May 1975.

A:      They probably couldn't five months later.

Q:      Okay.  But you do - -

A:      I mean, if they had done the investigation immediately
        when I gave them my alibi and went to those people and
        questioned them - - like I say, Mrs. Osby was the older
        lady - -

Q:      Uh-huh.

A:      - - and she probably had lack of recall.

Q:      Okay.

A:      So if they had went when I first told them where I was at,
        rather than waiting for five, six months later, I'm sure that
        it would have been more clear than what they got later.

(Evidentiary Hearing, November 20, 2007, 350-51).

        Petitioner testified that he informed his trial attorney about his alleged alibi.  (Tr. 351-52).

Thus, contrary to Petitioner's assertion, his ability to question the Osbys about his alleged alibi was not

dependent upon the disclosure of any police reports.   Petitioner and his attorney were aware of

Petitioner's alleged alibi and Petitioner could easily have spoke with the Osbys in a more timely fashion.

Accordingly, the failure to disclose to Petitioner the police reports describing the interviews with the

-36-

Osbys does not implicate *Brady*. *See, e.g., Bell v. Bell*, - - - F.3d - - -, 2008 WL 50315 at *9 (6th Cir., Jan. 4, 2008) (recognizing that where "the factual basis for a claim is reasonably available to the petitioner or his counsel from another source," *Brady* is not implicated by the alleged failure by the prosecution to supply such information to the defense) (quoting *Matthews v. Ishee*, 486 F.3d 883, 891 (6th Cir. 2007)).


       7.     Conclusion

While the State's failure to disclose to Petitioner the police reports in this matter is disturbing, as the Supreme Court has made clear, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Whitley*, 514 U.S. at 436-37. Rather the withheld material, when considered as a whole, must evidence a "reasonable probability of a different result." Stated differently, Petitioner must demonstrate that the withheld evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Petitioner has not made this showing.

As the trial judge correctly recognized, the outcome of Petitioner's trial hinged on two factors: (a) identification and (b) credibility. With respect to the identification of Petitioner as one of the Laitys' assailants, the trial judge found that the lighting conditions at the time of the robbery were sufficient to permit an identification of the assailants. (Trial Transcript, December 3, 1975, 204). The judge found that the Laitys' were able to observe their assailants - from a close distance - for a significant period of time. (Tr. 205-06). These findings are well supported by the evidence and are not undermined by the undisclosed police reports.

The judge found that the Laity's in-court identification of Petitioner was unequivocal and made without hesitation.  (Tr. 205-09).  The judge recognized that Mr. Laity was unable to positively identify Petitioner at the one line-up in which Petitioner participated, but noted that at the line-up Mr. Laity had an opportunity to observe the participants for only a "short interval" illustrated by Mr. Laity "by the snapping of his fingers."  (Tr. 207).  The judge also recognized that Mrs. Laity did positively identify Petitioner at the line-up. (Tr. 207).  The judge further observed that after having the opportunity to closely observe Petitioner for more than a "short interval," the Laitys positively identified Petitioner as one of their assailants at both the trial and preliminary examination.  (Tr. 205-09).  These conclusions are likewise amply supported by the evidence and are not lessened by the undisclosed police reports.

With respect to credibility, the judge found that:

> This court does not believe that the defendant found this valuable ring in the grass that he was cutting at the home where he was staying some 10 days after the robbery.  This is the same grass which he had cut a week or so before and several days after the robbery and the ring was not then present.  That point is just noted but is not decisive, of course.  The story of the defendant on this ring does not even raise a reasonable doubt.

(Tr. 209-10).

The judge's conclusion that Plaintiff was unworthy of belief is reasonable and well-supported.  In this respect, the Court notes that at the evidentiary hearing, Petitioner acknowledged that his trial testimony was untruthful.  (Hearing Transcript, November 20, 2007, 299-301, 359).  At the evidentiary hearing, Petitioner testified that his cousin gave him the ring.  (Tr. 299-301).  The Court further notes that one of the undisclosed police reports contains yet a third description of how Petitioner alleges he obtained Mrs. Laity's ring.  On June 11, 1975, Detective Robert Massengale completed a reported concerning his investigation of the Laity robbery.  (Petitioner's Hearing Exhibit 7 at 6-7).  Detective Massengale's report contains the following:

The undersigned officer went to the Modle Loan Company at 78 W. Wall. While at the Modle Loan Company, the undersigned officer interviewed a Robert Zepik, manager of the Modle Loan Company. Mr. Zepik stated that on 6-10-75 in the PM, while working at the Modle City Loan Office he was approached by two black males, Mr. Zepik stated that one of the black males remained near the door and he had a conversation with the other subject. Mr. Zepik described the two subjects as being black males with one taller than the other. From the description that Mr. Zepik gave, it appears that he in fact did talk with Floyd Caldwell. Mr. Zepik stated that the taller of the two black males approached him and advised him that he had a ring in his possession that had just been released to him by the police department. Mr. Zepik further stated that the taller black male advised him that he had found the ring some time ago and turned the ring over to the police department in hopes that it would be returned to its right owner. Mr. Zepik further stated that the tall black male then advised him that the police department was unable to locate the right owner and due to the amount of time that elapsed, the ring could now be returned to him as his own personal property. Mr. Zepik stated that the subject then advised him that the ring had been appraised for approximately $700.00, and he stated that he was willing to sell this ring if he could obtain approximately $500.00 for this ring. Mr. Zepik stated that the suspect advised him that he had been offered a total of $300.00 for the ring but felt that in his opinion the ring was worth $700.00 but he (Floyd) would be willing to part with the ring for $500.00. Mr. Zepik advised the suspects that he wasn't interested in this type of business, at which time the two forementioned subjects left the premises.

*Id.* at 7.

In short, the record in this matter reveals that Petitioner has related at least three different versions of how he came to possess Mrs. Laity's ring, none of which are particularly credible. The Court, therefore, finds that the trial judge's assessment of Petitioner's credibility is well-supported.

The Court concludes, therefore, that consideration of the undisclosed evidence in this matter does not result in a "reasonable probability of a different result." Furthermore, consideration of this evidence does not reasonably "put the whole case in such a different light as to undermine confidence in the verdict." Accordingly, Petitioner has failed to demonstrate that he was deprived of the right to a fair trial by the State's failure to provide him with the undisclosed evidence at issue. However,

even were the Court to conclude that Petitioner had stated a valid *Brady* claim, Petitioner is still not entitled to relief because he has failed to demonstrate by clear and convincing evidence that he is actually innocent of the crimes for which he was convicted, as required by 28 U.S.C. § 2244(b)(2).

IV.        Evidentiary Hearing

As detailed above, because Petitioner has asserted his *Brady* claim in a second or successive petition, he must demonstrate that the factual basis for his *Brady* claim could not have been discovered previously through the exercise of due diligence.  He must further establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.  While Petitioner has established good cause for his failure to previously assert his *Brady* claim, the evidence in this case, including that presented at the evidentiary hearing, does not entitle Petitioner to relief.  Before discussing whether Petitioner has established that he is innocent of the crimes of which he was convicted, a brief review of the testimony presented at the evidentiary hearing may be helpful.

A.        Testimony Concerning Petitioner's Due Diligence and Identity of *Brady* Material

Much of the evidence which Petitioner presented at the evidentiary hearing addressed either the issue of whether there existed good cause for Petitioner's failure to assert his *Brady* claim in his previous request for habeas relief or identifying precisely what evidence was not provided to Petitioner prior to trial.  The Court finds that Petitioner exercised due diligence in this matter and could not have learned that he possessed a potential *Brady* claim prior to submitting his first petition for writ of habeas corpus.  To the extent, therefore, that the witnesses at the evidentiary hearing testified regarding the issue of due diligence, a review of such is not necessary.  The Court has also addressed the

*Brady* material issue in section II above.  Accordingly, to the extent that the witnesses at the evidentiary hearing testified concerning such, a review of such is likewise unnecessary.  The following individuals presented testimony on these issues: (1) Rick Brundrett; (2) Peter John VanHoek; (3) Charlette Pugh Tall; (4) Paul Jancha; and (5) Patricia Hubbard.

       B.     Perry Davis

Davis testified that he was one of the police officers that was dispatched to the Laity residence immediately following the robbery.  (Hearing Transcript, November 15, 2007, 30-31).  Davis testified that he observed an area near the Laity residence where someone could have waited in hiding before robbing the Laitys.  (Tr. 32).  Davis testified that it was possible to access Lavette Street from this location.  (Tr. 32).  Davis testified that he later heard "radio traffic" concerning two individuals that were observed on Lavette Street.  (Tr. 32).  Davis testified that this was the extent of his involvement in the investigation of the Laity robbery.  (Tr. 32-34).

       C.     Robert Krause

Krause testified that during 1975 and 1976 he was employed by the Berrien County Sheriff's Department as "the officer in charge of records and identification."  (Tr. 56-57).  Krause testified that as part of this position he was required to "quite frequently" assist in the presentation and memorialization of line-ups.  (Tr. 57).  Specifically, Krause often completed the line-up sheets and took photographs of the individuals who participated in the line-up.  (Tr. 57-67).

Petitioner has submitted into evidence two photographs and two line-up reports.  (Petitioner's Hearing Exhibits 4-5).  The photograph contained in Exhibit 4 has the date "6-12-75"

written on it and accompanies the report for the "first line-up." (Petitioner's Hearing Exhibit 4). The photograph contained in Exhibit 5 has the date "6-24-75" written on it and accompanies the report for the "second line-up." (Petitioner's Hearing Exhibit 5). Krause testified that he took these two photographs and that the dates affixed thereto indicate the date on which the particular photograph was taken. (Tr. 57-67). Krause further testified that he prepared the line-up report for the "second line-up" in which Petitioner participated. (Tr. 60-64).

D.      Michael Sinke

Sinke is employed as a forensic specialist for Speckin Forensic Laboratories. (Tr. 78-79). The Court permitted Sinke to testify as an expert in the field of latent fingerprint analysis. (Tr. 81).

Sinke testified that he examined the "original" fingerprint lifts obtained from the Laity's vehicle. (Tr. 82-83). Sinke testified that two of the fingerprints were identified as belonging to Harry Laity. (Tr. 83). With respect to the third fingerprint, Sinke observed that it had been characterized as "not identifiable." (Tr. 84). Sinke testified that after examining this fingerprint he likewise concluded that "there are not enough identifying characteristics contained within that print that you're going to ever positively identify it with an individual." (Tr. 84). Sinke further testified, however, that it is sometimes possible with such fingerprints to "eliminate somebody as having left that print." (Tr. 85).

Sinke compared this particular fingerprint to fingerprints from the following individuals: (1) Floyd Caldwell; (2) Sidney Cladwell; (3) Eliza Osby; (4) Ray Charles Osby; and (5) Isiah Fowler. (Tr. 85). Sinke concluded that the third (not identifiable) fingerprint, recovered from the Laity's vehicle, did not belong to any of these individuals. (Tr. 86).

E.     Paul Jancha

Jancha represented Petitioner at his 1975 criminal trial.  (Tr. 118-19).  Jancha testified

that the Laitys participated in two separate line-up procedures.  (Tr. 145-46).  Jancha also noted that he

had "a long-ago recollection of there being some sort of dispute regarding the line-up dates."  (Tr. 150).

When asked whether he remembered talking off-the-record to Deputy Haas during Petitioner's trial to

clarify the dates on which these two line-up procedures occurred, Jancha responded:

> I have no recollection of that.  I would indicate that throughout my
> practice I've had a good relationship with officers, and if - - if something
> like that happened at trial, there was a good reason for that to happen.
> But I don't recall.

(Tr. 146-47).

Jancha subsequently acknowledged that he had no independent recollection of the dates

on which the two line-ups occurred.  (Tr. 170).  When reminded that at trial he stipulated that the two

line-ups occurred on the same day, Jancha responded that "if I stipulated that they occurred on the same

day, then they did occur on the same day."  (Tr. 170-71).

F.     Dr. Solomon Fulero

Dr. Fulero testified as an expert in the area of "eyewitness identification."  (Tr. 190-94).

He testified regarding the "reconstructive theory of memory."  (Tr. 195).  The doctor testified that

pursuant to this theory, memory is divided into three stages: (a) acquisition; (b) maintenance; and (c)

retrieval.  (Tr. 196-97).  According to Dr. Fulero there exist several factors which impact the accuracy

of these various stages.  (Tr. 197-98).

With respect to the acquisition stage, the doctor testified that one of the relevant factors

is "exposure time."  (Tr. 198).  According to Dr. Fulero, exposure time is defined as the length of time

that the witness is "looking at the face." (Tr. 198). The doctor testified that other factors relevant to the acquisition stage are "eyesight, distance, lighting, you know, obstructions." (Tr. 199-200). Dr. Fulero also asserted that "the accuracy of eyewitness identification is impaired" by the phenomenon of "weapons focus." (Tr. 200-01). According to Dr. Fulero, the existence of a weapon during the acquisition stage causes the individual to focus on the weapon rather than the facial features of the individual wielding the weapon. (Tr. 201-02).

The doctor testified that it is necessary to analyze a victim's "early descriptions" of a perpetrator to determine whether the victim's "ultimate retrieval" was corrupted by "post-event information." (Tr. 202). Accordingly, Dr. Fulero testified that any police reports which memorialized the Laity's initial descriptions of their attackers would have contained "valuable" information. (Tr. 203-05). Dr. Fulero testified that "cross-racial identifications" are generally less accurate. (Tr. 205-07). On cross-examination, however, the doctor acknowledged that "the more experience people have with other races, the better they get at discriminating face shapes, and that kind of thing." (Tr. 225-27).

The doctor testified that "the instructions that a witness is given prior to an identification procedure is really important." (Tr. 208). According to Dr. Fulero, the witness must "understand the nature of their task as not being we have a suspect, here's a group of people, tell us which one it is." (Tr. 208). Instead, the witness should be instructed that "the person you saw may or may not be in this group of people." (Tr. 208). In Dr. Fulero's opinion, the Laity's testimony identifying Petitioner as their attacker "isn't strong." (Tr. 216).

At Petitioner's trial, Mrs. Laity testified an individual's head could be characterized as brachycephalic[3] or dolichocephalic.[4]  (Trial Transcript, December 2, 1975, 94).  She further testified that with respect to her husband's attacker, "the individual's head was dolichocephalic, which means the length is greater than the width, it is not nearly round or square head, and I think that stood out."  (Tr. 94).  Dr. Fulero testified that he had "never heard" the terms brachycephalic or dolichocephalic and, therefore, did not consider it necessary to investigate those concepts.  (Hearing Transcript, November 19, 2007, 227, 229-30).  Accordingly, Dr. Fulero was unable to offer an opinion regarding Mrs. Laity's testimony on the subject.  (Tr. 229-30).

G.       Floyd Caldwell

Petitioner testified that his defense at trial was that he had an alibi and that he "had found the ring."  (Tr. 297).  With respect to his alibi defense, Petitioner testified that prior to trial he informed his attorney that he had an alibi.  (Tr. 297-98).  Specifically, Petitioner testified that on the night of the robbery he was in Eau Claire, Michigan, visiting with "Mrs. Osby."  (Tr. 298).  Petitioner testified that he "stayed at her residence for most of the part of the evening up until the night," before returning to Benton Harbor.  (Tr. 298-99).

With respect to Mrs. Laity's ring, Petitioner testified that his previous trial testimony that he had found the ring "absolutely wasn't true."  (Tr. 299).  Petitioner testified that what really happened was that "approximately a week or so, maybe closer to two weeks before I was arrested for the ring," he

---

[3]  Brachycephalic refers to a "short headed or broad headed" individual.  *See, e.g.,* Merriam-Webster Medical Dictionary, *available at* http://medical.merriam-webster.com/medical/brachycephalic (last visited on January 29, 2008).

[4]  Dolichocephalic refers to an individual with "a relatively long head."  *See, e.g.,* Merriam-Webster Medical Dictionary, *available at* http://medical.merriam-webster.com/medical/dolichocephalic (last visited on January 29, 2008).

had a party at his residence.  (Tr. 299-300).  According to Petitioner, "we had gotten low on beer or ran out of beer, so what we would do everybody would ante-up, you know, put money in the pot, and we would go get a case of beer, or two, whatever it was."  (Tr. 300).  Petitioner further testified "in putting the money together, my cousin Sidney, he had a ring."  (Tr. 300).  Petitioner asserted that Sidney gave him the ring.  (Tr. 300-01).  Petitioner asked Sidney where he obtained the ring, but Sidney "didn't tell [Petitioner] where he got the ring."  (Tr. 300).  Petitioner asserted that he did not know whether Sidney stole the ring, but Petitioner acknowledged that he "suspected something" because "Sidney didn't have the resources to purchase this type of ring."  (Tr. 305-08).  Petitioner placed the ring on his china cabinet where it remained until June 10, 1975.  (Tr. 301).

　　　　With respect to his activities on June 10, 1975, Petitioner testified that he took the ring to Fox's Jewelry "to get it cleaned and appraised."  (Tr. 301).  However, after being informed that the ring was "probably worth $500," Petitioner "started to think about selling it."  (Tr. 301).  Petitioner acknowledged that he then took the ring to various locations obtaining estimates of the ring's value, before being arrested.  (Tr. 302-03).

　　　　Petitioner also testified about the line-up in which he participated.  The report of the "second line-up" sheet, the line-up in which Petitioner participated, was accompanied by a photograph.  (Petitioner's Hearing Exhibit 5).  This particular photograph was originally dated "6-24-75."  *Id.*  At trial, however, Petitioner's attorney stipulated to change the date on this photograph to "6-12-75."  (Trial Transcript, December 2, 1975, 56-60).  As Petitioner's attorney stated at trial, this was accomplished because the date originally written on the photograph was "incorrect and that both exhibits - - both line-ups did occur on June 12, 1975."  (Tr. 59).

At the evidentiary hearing, Petitioner testified that this particular photograph was, in fact, taken on June 24, 1975.  (Hearing Transcript, November 20, 2007, 309-15).  Petitioner acknowledged that he participated in a line-up on June 12, 1975.  (Tr. 310, 316).  Petitioner asserted, however, that contrary to the line-up report, which indicates that he was in the third position in the line-up, he was actually in the fourth position in this line-up.  (Tr. 309-11, 316).  Petitioner further asserted that despite the fact that his attorney signed the photograph in question, his attorney was not present when the photograph was taken.  (Tr. 317-18).

V.          Petitioner has not Demonstrated that he is Actually Innocent

As noted above, to obtain relief Petitioner must demonstrate by clear and convincing evidence that he is actually innocent of the crimes of which he was convicted.  Petitioner has advanced several grounds in support of his position that he has satisfied this standard.  As detailed below, however, the Court concludes that Petitioner has failed to carry his burden.

A.          Fingerprint Evidence

Petitioner asserts that the fingerprint evidence in this case exonerates him in this matter. The Court disagrees.  The documentary evidence regarding the police reports reveals that the police obtained three fingerprints from the Laity's vehicle.  Two of these fingerprints were identified as belonging to Harry Laity.  The third fingerprint was considered "not identifiable."  Petitioner has presented no evidence contradicting this information.  With respect to this unidentifiable fingerprint, Michael Sinke testified that while it was not possible to ever positively identify who left this fingerprint, he was able to conclude that it did not belong to Petitioner.

-47-

While this evidence may arguably diminish the quantum of evidence against Petitioner, such fails to establish that Petitioner did not actually commit the crimes of which he was convicted. As noted above, however, it is not enough for Petitioner to establish that he was convicted on less than sufficient evidence, he must establish his factual innocence. The absence of fingerprints does not establish or suggest that Petitioner did not commit the crimes for which he was charged.

B.     Identification Evidence

Petitioner challenges the accuracy of the Laitys' identification of him as one of the individuals that robbed them on the night of May 30, 1975. In support of this challenge, Petitioner presented testimony from Dr. Solomon Fulero, who concluded that the Laity's identification testimony "isn't strong." Petitioner also testified as to alleged discrepancies in the memorialization of the line-up in which he participated. While the Court recognizes that the Laitys' identification testimony is not unassailable, Petitioner has failed to demonstrate that no reasonable person could have relied upon the Laitys' testimony identifying Petitioner as one of their assailants.

Petitioner acknowledges that he participated in a line-up conducted on June 12, 1975. According to the report of this line-up, Petitioner was in the third position. The report further indicates that Mrs. Laity positively identified Petitioner. Mr. Laity also identified Petitioner, but the report notes that Mr. Laity was "not positive." The report of this line-up was signed by Officer Krause and Petitioner's trial attorney, Paul Jancha. Petitioner now asserts that the results of this line-up are invalid because he was not in the third position, but was instead in the fourth position.

In support of his position, Petitioner offers two arguments. Petitioner first asserts that the photograph which accompanied the report of this particular line-up was not taken on the date of the

line-up, but was instead taken on June 24, 1975.  Petitioner claims that the photograph that was taken contemporaneous with the June 12, 1975 line-up reveals that he was, in fact, in the fourth position in the line-up.  Petitioner also testified that during the June 12, 1975 line-up he was in the fourth position.

The Court is not persuaded by Petitioner's argument.  The Court recognizes that there perhaps exists a legitimate question as to whether the photograph which accompanies the line-up report was taken on June 12, 1975, or on June 24, 1975.  Such is largely irrelevant, however.  The actual report of the line-up clearly identifies Petitioner as occupying the third position.  Petitioner's attorney was present at this line-up and signed the report.  This constitutes very strong evidence that Petitioner was, in fact, in the third position in the line-up.  As for Petitioner's testimony suggesting otherwise, the Court finds Petitioner's testimony to be contradicted by other evidence.

While Dr. Fulero concluded that the Laity's identification testimony "isn't strong," an examination of his testimony, in conjunction with the evidence in this matter, leads to the conclusion that Dr. Fulero's opinion falls short of establishing Petitioner's actual innocence.  The doctor testified that the following factors were relevant when assessing the accuracy of the Laity's identification testimony: (a) exposure time (i.e., the length of time that the witness is "looking at the face"); (b) eyesight; (c) distance; (d) lighting; and (e) obstructions.  Mr. and Mrs. Laity both testified that due to Petitioner's physical proximity during the robbery they were able to look directly at his face.  The Laitys also testified that the lighting conditions at the time of the attack were more than sufficient to permit an identification.  There was no evidence presented at trial or at the evidentiary hearing that either of the Laitys' view of Petitioner was obstructed.  Likewise, no evidence has been presented that either of the Laitys suffered from poor eyesight.  Analysis of these particular factors, therefore, does not advance Petitioner's cause.

Dr. Fulero also challenged the Laitys' identification testimony on the basis that, generally speaking, "cross-racial identifications" are less accurate.  The doctor also acknowledged, however, that while cross-racial identifications are generally less accurate, "the more experience people have with other races, the better they get at discriminating face shapes, and that kind of thing."  The Court notes that Mrs. Laity testified that she had experience teaching "a large number of black students."  (Trial Transcript, December 2, 1975, 98).  Thus, while the doctor's testimony in this regard may serve to diminish Mr. Laity's identification testimony, such does not appear to be the case with respect to Mrs. Laity's testimony.

Dr. Fulero also questioned the accuracy of the Laity's identification testimony by suggesting that the Laitys had not been properly instructed prior to participating in the two line-up procedures.  The Court agrees with the doctor that "the instructions that a witness is given prior to an identification procedure is really important."  The Court further agrees with Dr. Fulero that the witness must "understand the nature of their task as not being we have a suspect, here's a group of people, tell us which one it is," but that the witness should instead be instructed that "the person you saw may or may not be in this group of people."  The record contains no evidence, however, that the Laitys were provided improper or otherwise suggestive instructions prior to participating in the two line-ups.  In this respect, the Court notes that Petitioner was not even a participant in the first line-up.  If the police had been attempting to improperly "guide" the Laitys to identify Petitioner, as Dr. Fulero suggested, it seems unlikely that Petitioner (the alleged target of such behavior) would not be included in the initial line-up.

In conclusion, the Court recognizes that the evidence supporting the Laitys' testimony that Petitioner was the man who attacked Harry Laity on the night of May 30, 1975, is not beyond question.  Specifically, Harry Laity's performance at the two line-ups, as well as his testimony regarding

such, raises questions about the accuracy of his identification of Petitioner.  On the other hand, Mrs. Laity positively identified Petitioner out of a line-up.  Moreover, her testimony regarding the issue of identification was largely unchallenged on cross-examination and was completely consistent with the police reports in this matter.  Finally, to the extent that the witnesses' credibility bears on the question of identification, the Court, for the reasons discussed herein, finds ample support in the record for the trial judge's determination that Petitioner was not credible.  For the reasons discussed herein, Petitioner's challenge to the Laity's identification testimony is not persuasive.  Petitioner has failed to demonstrate by clear and convincing evidence that no reasonable person could have relied upon the Laity's identification testimony.

C.      Conclusion

For the reasons articulated herein, the Court concludes that Petitioner has failed to establish by clear and convincing evidence that he is innocent of the crimes for which he was convicted. While the Court is disturbed by certain aspects of this matter, the evidence of Petitioner's guilt is substantial.  Moreover, while the Court finds Petitioner's sentence to be excessive, no issue regarding such is presently before the Court.  While the Court is not persuaded by the merits of Mr. Caldwell's claim, the efforts of Ms. Nieuwenhuis and her staff have ensured that (to the extent that such is possible more than 30 years later) Mr. Caldwell's claim was thoroughly explored and vigorously argued.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Caldwell's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  March 7, 2008                                          /s/ Ellen S. Carmody
                                                        ELLEN S. CARMODY
                                                        United States Magistrate Judge